**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Case No. 3:22cr33 (OAW)** |
| | : | |
| **v.** | : | |
| | : | |
| **JOHN TRASACCO** | : | **March 21, 2023** |

### GOVERNMENT'S SENTENCING MEMORANDUM AND MOTION FOR A SENTENCE ABOVE THE GUIDELINE RANGE

### I.      Introduction

John Trasacco conspired with Michael DiMassa to steal from the citizens of West Haven over $400,000 in funds designated for COVID relief during the pandemic.   Trasacco himself kept virtually all of the proceeds of the crime.   For the reasons stated below, because § 2B1.1 of the Sentencing Guidelines does not fully account for the particular nature and circumstances of Trasacco's offense conduct, the Court should exercise its discretion under § 3553(a) and impose a sentence above the advisory Guideline range; order the defendant to pay restitution; and impose a period of supervised release that will ensure that in the future, Trasacco will at last live a life within the confines of the law.

### II.      Offense Conduct

On December 2, 2022, the jury convicted Trasacco of conspiring to commit wire fraud in violation of 18 U.S.C. § 1349 and substantive wire fraud in violation of 18 U.S.C. § 1343. During the course of the trial, the Court heard extensive testimony of how Trasacco gave DiMassa phony invoices from two entities

1

controlled by Trasacco, L&H and JIL, for products and services that had never been ordered by West Haven.   A litany of West Haven municipal officials testified that they had neither ordered nor seen any of the goods listed on the fraudulent invoices. Some of the buildings listed on the JIL invoice that were to be reviewed for a supposed $184,019 ultraviolent ("UV") light cleaning by JIL had been closed and boarded up for some time. All told, the City of West Haven issued checks totaling $431,982 to Trasacco's entities, all of which he promptly cashed.

### A.    DiMassa Meets Trasacco Through Bernardo

At the time DiMassa met Trasacco, DiMassa and John Bernardo were operating a scheme involving an entity called Compass Investments that would eventually defraud West Haven of over $600,000.   Bernardo introduced DiMassa to Trasacco:.

> Q. Let's reset the scene. You went to Mickey Blakes?
>
> A. Yes.
>
> Q. And that was the first time you met John Trasacco?
>
> A. Yes.
>
> Q. And John Bernardo was there?
>
> A. That's correct.
>
> Q. And did John Bernardo introduce you to Mr. Trasacco?
>
> A. Yes.
>
> Q. And you sat down at a table?
>
> A. Correct.

Q. That the initial meeting, what did Mr. Trasacco tell you about himself?

A. He told me that he wrote screenplays or was a writer. He told me that he had been to prison in the past. He wrote in prison. He invented in prison. He told me about a coffee cup.

DiMassa Trial Testimony at 32-33.

Trasacco would go on to tell DiMassa that he (Trasacco) had been to prison in Mexico. He introduced DiMassa to an illegal gambling operation at Doma restaurant, and eventually collected money from DiMassa for wagers DiMassa made and lost through the Doma operation. *Id.* at 34-36, 40-44. Trasacco began to give DiMassa L&H invoices for COVID supplies that had never been ordered by West Haven. *Id.* at 44-45, 53-57, et seq. DiMassa processed the invoices and gave the checks to Trasacco at Doma. *See, e.g., id.* at 62-63. Trasacco cashed the checks despite delivering only a very small portion of the items on the invoices. *Id.* at 63-65, 69-70.

**B. Trasacco takes DiMassa to an Empty Building**

When DiMassa expressed concerns that multiple L&H invoices had been paid without much product, Trasacco took him into an empty building across the street.

Q. You walked out of Doma?

A. Correct.

Q. And did you walk across the street?

A. Yes.

Q. Where did you go after you walked across the street?

A. Through the alleyway back to the building.

Q. What happened next?

A. We proceeded to enter the building.

Q. And did you enter the building?

A. Yes.

Q. Once you are inside the building, what happened next?

A. We walked inside and kind of made a semi-circle around the inside until I got to the point where there was the glass-paned window and I was standing there and Mr. Trasacco was standing in front of me.

Q. And what happened next?

A. He thanked me for my help and he told me it was appreciated.

Q. Did he say anything else?

A. He didn't. But we didn't leave immediately. There was, like, an awkward pause. It was kind of an awkward pause. And then finally, yes, he proceeded to turn around and we left the building and then entered out into the alleyway in the back.

[…]

Q. Did he mention anything else?

A. He did mention that I had kept my word from our original conversation about COVID relief.

Q. What did you understand that to mean?

A. That I had obviously delivered on the invoices that he gave me.

Q. Without product?

A. Yes.

Q. And when you were standing there, where were you both standing in relation to the exit?

A. Mr. Trasacco was between myself and the exit.

Q. And where was he standing relative to you?

A. Close. We were very close together.

Q. How did this make you feel?

A. Kind of uneasy, to say the least.

[…]

Q. You said you felt uneasy?

A. It did not make me feel comfortable, no.

[…]

Q. Where you concerned for your safety?

A. Yes.

Q. What do you mean by that?

A. I was concerned that after the first conversation about L & H, about the amount of money, I was concerned that there would be a continued push and that my pushing back on further --

[…]

Q. Were you concerned for your safety?

A. Yes, I was.

Q. Why?

A. I was concerned because of our first conversation, that because of my pushback on the amount of money and the lack of product, that if I didn't continue doing this

there would be issues.

DiMassa Trial Testimony at 104-107.

Trasacco continued to provide DiMassa with fraudulent L&H invoices, and Trasacco personally received all of the money that West Haven paid to L&H by depositing the checks into an account controlled solely by Trasacco.   Eventually, the L&H fraud was abandoned because hundreds of thousands of dollars of invoices have been processed for items never ordered or received by West Haven, and DiMassa was concerned that the amount of money paid to L&H for these tangible items would eventually draw attention.   *Id*. at 114-16, 124-28.     Trasacco, Bernardo and DiMassa subsequently conspired to start a new fraud scheme, proposed by Trasacco, in which Trasacco would purport to provide UV light cleaning services to West Haven. *Id*. at 125.   Bernardo, Trasacco and DiMassa agreed to split to proceeds with each taking $40,000 with additional monies for Trasacco.   *Id*. at 128-29.   The very next day, Trasacco emailed to DiMassa a fraudulent invoice from JIL Sanitation Solutions LLC in the amount of $184,019.   *Id*. at 129-30. DiMassa called Trasacco and told him that given the amount of the invoice, more detail was needed.   Trasacco asked DiMassa to give him the square footage of the buildings listed on the invoice, which DiMassa did; Trasacco then sent a revised invoice to DiMassa.   *Id*. at 131-32.   DiMassa then arranged to have West Haven issue a check to JIL for the $184,019, and delivered the check to Trasacco, who once again retained all of the proceeds.   *Id*. at 133-34.

After DiMassa realized that the FBI was investigating his schemes, he and

Bernardo called Trasacco to tell him that the "jig is up." *Id*. at 138-40. DiMassa

and Bernardo were arrested shortly thereafter on a federal criminal complaint,

### C.     Trasacco Arranges a Post-Arrest Visit to DiMassa's Home

After DiMassa was arrested on a federal criminal complaint, he received a

call from Trasacco, who had not yet been arrested:

> Q. What did he say to you?
>
> A. He reached out, basically said that the 116th District lost a good representative, and he also advised me that some of the people from Doma that I knew wanted to send food to the house, wanted to send something to the house.
>
> Q. Say that again?
>
> A. That some of the people that we mutually knew from Doma wanted to send food to my house.

DiMassa Trial Testimony at 145.

DiMassa indicated that he left his residence but that a security camera at his

home recorded the fact that a unknow male showed up at his home

> Q.     Tell the jury what happened.
>
> A.     So around early afternoon according to the time stamp on the video, I was able to see a gentleman in a hoodie, completely the hood covering most of his face from the view of this camera.

*Id*. at 147.

DiMassa indicated to the federal law enforcement that he did not recognize

the man at his door and the individual did not have any food in his hands. No one

from Doma ever came to deliver food to DiMassa.

In the end, DiMassa explained he facilitated Trasacco's schemes due to several

reasons:

> Q. Is there, at the end of the day, is there a reason
>
> that you and helped Mr. Trasacco steal $400,000 from West Haven?
>
> A. Yes. I mean, as far as the scheme progressed the fear that there was no way for me to stop it was another reason to continue, for my participation to continue.
>
> Q. Why did you feel there was no way for you to stop it?
>
> A. A couple of reasons. One being I did not know whether or not Mr. Trasacco was aware of Compass. I knew of the connection with my gambling debts with Mr. Perreta and Mr. Trasacco, from paying Mr. Trasacco. I also, obviously through my pushing back on L & H invoices at times, the dollar amount, was concerned when he reacted negatively to that. It was concerning. And certainly the experience across the street from Doma was a factor. So all of those items.
>
> […]
>
> Q. What do you mean by the experience across the street from Doma?
>
> A. The walk through the alley into the shop in the back that he was looking to rent, and obviously the experience in that shop, the awkward encounter.
>
> Q. Was it just awkward?
>
> A. No, it was scary.
>
> Q. You were scared?
>
> A. Absolutely.
>
> Q. Are you scared of John Trasacco?

A. Yes, I am.

DiMassa Trial Testimony at 184-185.

### III.    **Guideline Calculation**

In the PSR, the probation officer concluded that the base offense level for

Trasacco's conduct under § 2B1.1 is 7,   Twelve levels are added because the loss

exceeded $250,000 but was less than $550,000, resulting in a total offense level of

19. PSR ¶¶ 31-41.   Thus, the total offense level is 19.   With a CHC of II, the

Guidelines recommend a term of incarceration of 33-41 months, a fine of $10,000 to

$100,000, and a term of supervised release of between 2 and 5 years.   *Id*. ¶¶ 90, 96,

102.

In his sentencing memorandum, Trasacco argues that he was a minimal or

minor participant in the conspiracy, and that the Court should therefore

downwardly depart from the Guideline range.   *See* Def's Sentencing Memo at 6

(Doc 267).   For the reasons stated below, the facts clearly establish that Trasacco

was not a minor participant in the wire fraud conspiracy.   As also stated below, the

Government believes that in consideration of the factors under § 3553(a), a sentence

of incarceration above the applicable Guideline range is warranted in this case.

### IV.    <u>Restitution</u>

During his conspiracy with DiMassa, Trasacco received a total of $431,982 in

COVID relief funds from West Haven, through L&H and JIL.   The PSR

recommends that Trasacco be ordered to pay restitution in that amount.   PSR

¶ 104.   The Government notes, however, that Trasacco provided cash kickbacks of

about $20,000 in total to DiMassa and Bernardo.  Thus, like the other defendants in this case, the Government believes that Court should apportion Trasacco's restitution to include the amount that Trasacco gained from the scheme, and order him to pay restitution in the amount of $411,982.

## V.   A Sentence above the Suggested Guideline Range is Warranted Under 18 U.S.C. §  3553(a)

In this case, a sentence above the suggested guidelines range is warranted because there aggravating circumstances of a kind or to a degree not adequately taken into consideration by the Sentencing Commission.  *See e.g.* 18 U.S.C. § 3553(b).   An enhanced sentence is warranted under § 3553(a) for three reasons.

First, the Guidelines that apply to this case do not adequately capture the totality of Trasacco's offense conduct.   Both parties agree that the relevant Guideline section is § 2B1.1, which is primarily driven by loss amounts, and that calculation similarly will apply to DiMassa and the two other co-conspirators (Knox and Bernardo) who separately conspired with DiMassa.   Trasacco's conspiracy with DiMassa occurred in a materially different manner than DiMassa's other conspiracies.   With Bernardo and Knox, DiMassa approached each of them to initiate the fraud schemes.   DiMassa prepared the fraudulent invoices used to perpetrate the schemes, and DiMassa kept the bulk of the stolen money for himself. In sharp contrast, Trasacco approached DiMassa first with the L&H scheme and, when that scheme had run its course, Trasacco later proposed the JIL scheme. Trasacco provided the phony invoices from L&H and JIL to DiMassa.   And unlike DiMassa's other co-conspirators, Trasacco kept the vast majority of the fraudulent

proceeds of his conspiracy, providing only limited cash kickbacks to DiMassa and Bernardo.   Moreover, Trasacco tried to keep the schemes going through subtle manipulation.   He told DiMassa that he been in prison in the United States. Trasacco also told DiMassa that he had been in prison in Mexico.   Trasacco has been incarcerated in the U.S., but the FBI has not been able to confirm whether Trasacco's assertion that he spent time in a Mexican prison is correct.   Whether this assertion is true or was merely Trasacco attempting to portray himself as an intimidating figure is irrelevant, because DiMassa believed it to be true, meaning that Trasacco achieved his desired result.   Additionally, Trasacco collected gambling debts from DiMassa at Doma in Branford.   When DiMassa started to push back on the L&H scheme, Trasacco took him into an abandoned building and thanked DiMassa for keeping his "word" regarding the processing of the invoices for COVID relief funds.

After the FBI visited West Haven City Hall, DiMassa and Bernardo informed Trasacco that the "jig was up."   After DiMassa was arrested, Trasacco called him and said an individual from Doma as going to stop by DiMassa's home to deliver food.   Thereafter, a man in a hoodie arrived on DiMassa's doorstep.   He was not carrying any food.

Trasacco's repeated, successful efforts to manipulate and intimidate DiMassa, perpetuate the L&H scheme, and to begin the new scheme involving JIL are far beyond a typical fraud scheme, and are not accounted for under the ordinary operation of § 2B1.1 of the Guidelines.   Trasacco's conduct during his conspiracy

with DiMassa places him in a league apart from DiMassa's other co-conspirators, and a sentence above the suggested Guidelines range is warranted on these facts alone. In sum, Trasacco's criminal conduct was not like the other two related conspiracies and exceeds the normal considerations inherent in § 2B1.1. And as should be clear, they belie any effort by Trasacco to now cast himself as a "minimal" or "minor" participant in his conspiracy with DiMassa.

Second, a sentence above the recommended Guidelines range is necessary to serve the goal of specific deterrence. For two of the defendant's convictions, he spent over six years in jail. But this term of incarceration plainly did not deter him from committing the crimes in this case. Indeed, it appears that Trasacco used the fact that he had previously been incarcerated to influence DiMassa to continue with their scheme.

Third, Trasacco has an extensive criminal history that is not fully quantified in the Guideline analysis. According to the PSR, Trasacco has six prior criminal convictions, including for the Sale of a Controlled Substance, Assault in the First Degree, Robbery in the First Degree, and twice refusing a DNA test. Yet only one of these convictions counted for the purpose of assigning Criminal History points, and five prior convictions are not included in his criminal history score. In general, if a defendant's criminal history category substantially underrepresents the seriousness of his criminal history *or the likelihood that the defendant will commit other crimes,* a sentence above the suggested Guideline range can be imposed (emphasis added). *See e.g.* U.S.S.G. § 4A1.3. Here Trasacco committed two

independent crimes on different dates for which he received one sentence of seven years' incarceration. PSR ¶¶ 48-49. While serving that sentence, he was placed in punitive segregation. But these convictions and period of incarceration plainly did not decrease the likelihood that Trasacco would commit another crime. As a result, the Court needs to impose a significant sentence in order to provide specific deterrence to Trasacco and to protect the public from further crimes of the defendant. See e.g. § 3553(a)1(B) and § 3553(a)1(C).

Taking these three considerations together, a sentence above the suggested Guideline range is warranted for the defendant in this case.

## VI. The Defendant was Not a Minor Participant

The defendant argues that he deserves a reduction for minor role because, *inter alia*, his "charges are solely related to Michael DiMassa." Def's Brief at 7. Further, the defendant attempts to argue that "[g]iven the relative culpability between participants and the fact that Mr. Trasacco was the one who made any effort to provide goods and services, Mr. Trasacco should be afforded a mitigating role adjustment. *Id*.

It is difficult to understand how this argument entitles the defendant to a reduction for a minor role. The uncontested evidence at trial was that both the L&H scheme and the JIL scheme originated from the defendant once he learned that DiMassa had access to Covid funds from West Haven. Further, Trasacco kept almost all of the proceeds from those schemes.

The defendant attempts to advance the fiction that he is a legitimate businessman who intended to deliver goods to West Haven, ignoring the facts that none of the goods and services had ever been requested by West Haven. But the jury rejected this narrative and convicted him on all counts. As the individual who initiated both schemes, kicked back a small portion of the proceeds to DiMassa, and kept the rest of that money which he dissipated for his own interests (largely at a casino), it is plain that a mitigating role is not warranted in this case. Indeed the facts show that, while DiMassa was an essential part of these conspiracies, the defendant was the driving force behind these crimes.

Further, the defendant attempts to make much that L&H made apparel and had a warehouse in Branford. *See* Def's Brief at 7 and Exhibit B. The company does not appear to generate any income for the defendant and appears to have never filed a tax return. Further, according to the PSR, it is not clear how the defendant financially supports himself or where he obtained $500,000 for this business venture. PSR ¶ 119. The defendant has no stable income and lives with his girlfriend who works as a waitress and owns the home in which he lives. PSR ¶ 79. The defendant indicates that the businesses outlined in the Offense conduct in this case are no longer operating and he did not provide any additional information about those companies. PSR ¶ 80.

## VII. Analysis of the § 3553(a) Factors

Section 3553(a) directs the district court to consider a number of factors in imposing a fair and just sentence. Each criminal case is different and emphasizes different combinations of § 3553(a) factors. In this matter, the Government believes the most important § 3553(a) factors are the (1) the nature and circumstances of the offense, (2) promoting respect for the law; (3) just punishment, (4) specific deterrence and (5) general deterrence.

### A. The Nature and Circumstances of the Offense

There's little doubt that the theft of public funds designated for COVID relief constitutes of a serious offense. And while the defendant was not a public official, he plainly exploited the situation to obtain COVID funds through DiMassa. As indicated above, this conspiracy was largely driven by the defendant for his own benefit. A significant sentence of incarceration is warranted.

### B. The Sentence Must Promote Respect for the Law and Provide Just Punishment

The sentence in this case must promote respect for the law. Considering the municipal funds were specifically earmarked to address an ongoing historic pandemic, a significant period of incarceration is particularly warranted to promote respect for the law. And such a sentence provide just punishment. Those who take from the public in a time of need deserve a significant punishment.

### C. The Sentence Must Provide Specific Deterrence

In this case for this defendant, specific deterrence is one of the most important considerations for the Court under § 3553. This defendant has six prior

convictions, including for both Assault in the First Degree and Robbery in the First Degree. And then he committed these crimes years later. It is plain that the defendant has little respect for the law. Of the defendant's six convictions, only one resulted in criminal history points being used to determine the applicable term of incarceration under the Guidelines.

For the assault and robbery convictions , the defendant effectively received a sentence of seven years in prison, even though the offenses occurred approximately one month apart. See PSR ¶ ¶ 48-49. But even in prison, his conduct did not change. While incarcerated, he was cited for flagrant disobedience and received a period of time in punitive segregation. It is notable that this significant term of incarceration did not dissuade the defendant from committing the new offenses in this case. This augers for a sentence of incarceration above the applicable range in this case.

### D. The Sentence Must Provide General Deterrence

Additionally, the Court should consider general deterrence. Here, the defendant conspired to steal municipal funds with an employee of that municipality But, these funds were specifically designed to provide relief from the COVID pandemic for the citizens of West Haven. The public should know that stealing municipal funds earmarked to alleviate the economic ravages of the pandemic will result in a felony conviction and a period of incarceration.

## VIII.  Conclusion

After considering the Sentencing Guidelines and the other sentencing factors under 18 U.S.C. § 3553(a), the Court should impose a term of incarceration above the applicable Guideline range and order the defendant to pay $411,982 in restitution.


Respectfully submitted,

VANESSA ROBERTS AVERY
UNITED STATES ATTORNEY

/s

RAY MILLER
ASSISTANT UNITED STATES ATTORNEY
FEDERAL BAR NO. CT 20451

DAVID J. SHELDON
FEDERAL BAR NO. CT 07997
ASSISTANT UNITED STATES ATTORNEY

157 CHURCH STREET, 23RD FLOOR
NEW HAVEN, CT 06510
(203) 821-3700

## CERTIFICATE OF SERVICE

This is to certify that on March 21, 2023 a copy of the foregoing

Memorandum was filed electronically.   Notice of this filing will be sent by email to

all parties by operation of the Court's electronic filing system or by mail on anyone

unable to accept electronic filing as indicated on the Notice of Electronic Filing.

Parties may access this filing through the Court's CM/ECF System.

    /s

Ray Miller
Assistant U.S. Attorney
