**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

UNITED STATES OF AMERICA          :
                                  :
          v.                      :          Criminal No. 3:22-CR-33 (OAW)
                                  :
JOHN TRASACCO,                    :

**RULING ON MOTIONS FOR ACQUITTAL AND NEW TRIAL**

The present case involves the misappropriation of public funds that were intended to provide relief to the residents of West Haven, Connecticut, from the effects of the COVID-19 pandemic. Defendant John Trasacco ("Defendant" or "Mr. Trasacco") was among four codefendants charged with stealing the relief aid. A retired firefighter named John Bernardo pleaded guilty to Conspiracy to Commit Wire Fraud on June 14, 2022; Lauren DiMassa, a pregnant, working mother (who had survived trauma and who was furthering her education while serving as the primary caregiver to her children) pleaded guilty to Conspiracy to Commit Wire Fraud on July 12, 2022; and on November 1, 2022, Michael DiMassa pleaded guilty to three counts of Conspiracy to Commit Wire Fraud. During the theft, Mr. DiMassa was a City of West Haven employee who was authorized to approve expenditure of the COVID relief funds (which totaled over $1 million). Of the four codefendants, Mr. Trasacco was the only one to exercise his right to a jury trial.

On December 2, 2022, a jury rendered verdicts of guilty as to Counts One and Two of the Indictment, which charged Mr. Trasacco with Conspiracy to Commit Wire Fraud in violation of 18 U.S.C. § 1343 (by way of 18 U.S.C. § 1349), and Wire Fraud in violation of 18 U.S.C. § 1343, respectively. ECF No. 217. Fourteen days later, on December 16, 2022, Mr. Trasacco filed the instant Motions for Judgment of Acquittal and for a New Trial,

ECF No. 228, and he requested an extended briefing schedule.  Afterward, the defendant filed additional motions and memoranda in support of the requests for acquittal and for a new trial.  ECF Nos. 248, 249.  For the reasons that follow, the motions, ECF Nos. 228, 248, and 249, hereby are **DENIED.**

## I.     PROCEDURAL FACTS

Defendant was indicted on February 17, 2022, ECF No. 26, and he was arrested and arraigned the following day (on February 18, 2022), ECF No. 48.  United States Magistrate Judge Robert M. Spector released him on an unsecured appearance bond in the amount of $100,000.  ECF Nos. 48, 49.  A jury trial took place on November 21—23, 28—30, and December 1, 2022, and on December 2, 2022, the jury needed less than one full day of deliberation to return verdicts of guilty as to each count.  ECF No. 217.

On December 16, 2022,[1] Defendant filed the instant Motions and requested an extended briefing schedule.  ECF No. 228.  The court granted in part the requested schedule.  ECF No. 232.  Defendant subsequently sought an additional extension, ECF No. 235, which the court again granted in part, ECF No. 239.  The court set deadlines of February 6, 2023, for Defendant's brief; March 8, 2023, for the government's opposition; and March 22, 2023, for the defendant's reply.  *Id.*

---

[1] Pursuant to Federal Rule of Criminal Procedure 29(c), "[a] defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict.  . . ." Fed. R. Crim. P. 29(c)(1).  Mr. Trasacco's motion was filed fourteen days following the return of the guilty verdict by the jury on December 2, 2022. Accordingly, the motion was timely. Fed. R. Crim. P. 29(c)(1).

## II.    RELEVANT STANDARDS

The United States Court of Appeals for the Second Circuit has held, "In reviewing the evidence on a motion for a judgment of acquittal, the court must be careful not to usurp the role of the jury. . . .   Thus, where 'either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the court] must let the jury decide the matter.'" *United States v. Jabar*, 19 F.4th 66, 76 (2d Cir. 2021), *cert. denied sub nom. Bowers v. United States*, 142 S. Ct. 1396 (2022) (quoting *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999)).   In considering such a motion, the court "'must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence.'"   *Id.* (quoting *United States v. Martoma*, 894 F.3d 64, 72 (2d Cir. 2017) (quotation marks omitted)).   Consequently, in arguing a motion for judgment of acquittal "the defendant 'faces a heavy burden.'"   *Id.* (quoting *United States v. Novak*, 443 F.3d 150, 157 (2d Cir. 2006) (quotation marks omitted).   "Only if 'the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt' may the court enter a judgment of acquittal."   *Id.* (quoting *Guadagna*, 183 F.3d at 130).

Federal Rule of Criminal Procedure 33 provides, in relevant part, "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."[2]   Fed. R. Crim. P. 33(a).   "It long has been our rule that trial courts

---

[2] Similar to a Rule 29 motion, "[a]ny motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilty."  Fed. R. Crim. P. 33(b)(2).  As such, Defendant's Motion, filed on the fourteenth day after the jury's verdict, is timely.

'must defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses.'" *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992) (quoting *United States v. LeRoy,* 687 F.2d 610, 616 (2d Cir.1982), *cert. denied,* 459 U.S. 1174 (1983)).  Further, "[i]t is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment." *Id.*  The court must determine "whether 'it would be a manifest injustice to let the guilty verdict stand.'" *Id.* (quoting *United States v. Reed,* 875 F.2d 107, 114 (7th Cir.1989)).  On such a motion, the defendant bears the burden of proof.  *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009).  Before it may order a new trial, the court must have "a real concern that an innocent person may have been convicted."  *Sanchez*, 969 F.2d at 1414.

## III.    DISCUSSION

### A.    Motion for Judgment of Acquittal

With respect to Count Two, charging Mr. Trasacco with Wire Fraud, Defendant argues that there was insufficient evidence adduced at trial to link the single transaction listed in that Count to a scheme to defraud.  ECF No. 248 at 3–6.  As to the conspiracy charged in Count One, Defendant further argues that the jury was not presented with sufficient evidence (regarding either of Mr. Trasacco's companies) to support its conclusion that there was a scheme to defraud, or that Mr. Trasacco and Mr. DiMassa had a meeting of the minds to join such a scheme.  *Id.* at 7.

#### *1. Wire Fraud (Count Two)*

Defendant avers that Count Two only refers to a single transaction – negotiation of a check made out to L & H Company LLC ("L & H") – and that based on the court's

instructions to the jury and its response to the jury's question thereupon, "[t]he jury necessarily understood . . . that there was **only one** wire transmission [it] **could consider** in assessing whether the government had met its burden of proof as to each element of Count Two . . . ."  ECF No. 248 at 4—5 (emphasis added).  This is hardly true.  Defense counsel went on to quote the court's response to the jury's question, which the court provides here, in its entirety:

> The government's charge at Count Two (Wire Fraud) references the overall scheme to defraud that it charges in Count One (Conspiracy to Commit Wire Fraud).  To the extent that the Wire Fraud charge at Count Two contextually refers to the overall scheme explained in Count One, you can consider the evidence related to JIL.

> However, Count Two (Wire Fraud) specifically references **only** the one check ending in 7003, made payable to L&H, as an interstate wire transmission that was used to carry out the scheme charged in Count One.

 The fact that the jury proceeded to deliberate without need for further clarification speaks for itself, particularly in its ability to render a unanimous verdict that same day, upon the strength of the evidence put forth by the government.

Additionally, "only one wire transmission" can be enough to prove wire fraud when that single wire transmission actually is fraudulent.  *See, e.g., United States v. Pereira*, 347 U.S. 1 (1954); *United States v. Piervinanzi*, 23 F.3d 670, 682 (2d Cir. 1994).  Surely, the government introduced substantial bases for a wire fraud conviction.  On the third day of evidence (Wednesday, November 23, 2022), the jury heard from Nathan Musick,[3] the government's ninth witness.  Mr. Musick (of Bank of America, in Pittsburgh, Pennsylvania) testified that John Trasacco opened a bank account for L & H at a West Haven branch of

---

[3] Mr. Musick's testimony can be found at pages 431 (line 13) through 491 (line 5) of the Transcript.

Bank of America, on December 26, 2019.  Mr. Trasacco signed a signature card and provided two forms of identification; he was the only signatory for this account.  On January 30, 2021, Mr. Trasacco changed the account to become an Individual Owner / Single Member LLC; in so doing, he affixed his signature, which matched the one he provided in 2019 upon originally opening that account.  Mr. Musick went on to detail a number of withdrawals in Mashantucket, Connecticut (home to a casino), leaving a $202.82 balance on January 14, 2021, followed by the deposit of a $63,356 check the next day.  Again, there were a number of large withdrawals (including at the casino), leaving a $315.50 balance on February 11, followed by the deposit of a $68,728 check on February 12.  March had multiple similar ($2,000 – $3,000) withdrawals, followed by $79,425 in deposits on April 23, via two checks apparently bearing Mr. Trasacco's signature.  The defendant's signature also appeared on a $38,854 check that was deposited on June 19, but the account (which had a $109,969.97 balance on April 23) dropped to a negative balance of (-$138.30) on July 28, and had $185.90 on August 31. The jury was able to consider whether this transaction history was consistent with legitimate business activity (large cash withdrawals, sometimes at casinos, that would drain a business account managed by a single signatory, with occasional large deposits – all while considering the source of income and whether any services were provided).

Mr. Musick then detailed the transactions involving an account for JIL Sanitation, an individual owner / sole proprietor / single-member LLC account that was opened by Defendant John Trasacco at the East Haven branch of Bank of America on July 12, 2021. Its balance was $194.01 on September 1, 2021, but then saw a $184,019 deposit on September 13, 2021.  On September 22, there was an $8,000 ATM withdrawal, and then

6

a $7,000 transfer to the L & H account, followed by another $8,000 transfer to L & H on September 29.  Another $25,000 was withdrawn from the JIL account on October 6, 2021. Then there were numerous withdrawals from the JIL account at the Foxwoods casino[4] in late October: $3,000 and another $2,000 on October 28, two more $3,000 withdrawals on October 29, some $14,000 on October 31, and then $10,000 on November 3. Eventually, the JIL balance was down to $122.88 on November 23, and $3.40 on December 29, 2021.  During this testimony, Attorney Lillian Odongo (for Mr. Trasacco) objected to the "repetitive" testimony regarding Mr. Trasacco's numerous withdrawals from the JIL business account while Mr. Trasacco was at the casino.  Transcript ("Tr.") at 465.  This objection was overruled (citing the robust cross-examination by Attorney Tracy Hayes that the court permitted as to government witness Frank Cieplinksi), and the government concluded its direct examination of Mr. Musick within the subsequent five minutes.

The jury also heard testimony from Scott Jackson, Finance Director for the City of West Haven (as of February 28, 2022), whose tenure in that role postdated the criminal activity prosecuted in this case.  Mr. Jackson testified that he knew of no evidence that either L & H or JIL Sanitation provided any goods or services to the City of West Haven.

Frank Cieplinski was Finance Director from 2019 through 2021, which covered the time when the crimes at issue in this case took place.  He testified that he was fired due to the criminal activity that took place during his tenure at the City of West Haven.

---

[4] Later, the jury heard testimony from Christopher Dowds, Assistant Financial Controller at Foxwoods (Mashantucket, CT), who detailed Mr. Trasacco's casino transactions, which were captured on camera. Several such transactions topped $10,000 per day, including $30,900 on November 1, 2021, which included a $7,000 cash advance.

Department heads or other representatives would submit vouchers billing for goods or services performed (indicating who was owed, and a description of the goods or services), representing that the invoice (bill) submitted by the provider was accurate; thereafter, the finance director would sign off to approve payment, confirming availability of the funds. Again, those submitting vouchers on behalf of a department would verify that a bill should be paid because goods or services were provided, and then Mr. Cieplinksi would approve payment if he could verify that West Haven had the available funds to cover such debt. On average, Mr. Cieplinski would review about fifty to one hundred vouchers per week. However, the Board of Education had its own budget and its own purchasing system.

Mr. Cieplinski testified as to numerous vouchers submitted by Mr. DiMassa that later were called into question. This began when Mr. Cieplinski was called by the mayor one morning before the finance director left home for work. He was instructed to hold all checks printed that morning, and to pull out those that were to go to Compass Investments because they had been flagged as calling for a large expenditure of COVID relief funds. During that review, payments intended for L & H also were identified as needing scrutiny. The same was true for payments set to go to JIL. And Mr. DiMassa had signed off on all of them before submission to the finance director.

There was the $63,356 voucher payable to L & H that purportedly would pay for masks and supplies headed to the Board of Education, and that indicated they would be shipped to Finance Director Cieplinski. Mr. Cieplinski had no idea why he would be the listed recipient, and confirmed that he had not received any of the 4,000 noted masks. Then, Mr. Cieplinski testified about a $68,728 voucher payable to L & H for 525 screens and frames purportedly going to West Haven's schools (along with a $560 setup fee), but

8

which never were delivered.  There was also a $76,925 voucher seeking to pay L & H for Board of Education COVID supplies never delivered to West Haven nor to its schools. And then there was a $38,954 voucher for another 2,000 masks, fifty screens and frames, and again, items noted but never delivered.  Each of these checks from West Haven were negotiated, but none of the goods or services were provided in exchange for payment.

Additionally, the jury heard testimony from Mr. Cieplinski about a $184,019 voucher to benefit JIL Sanitation Solutions for an assessment and study, and for cleaning and equipment (dated September 8, 2021); no such services or goods were provided.

In the end, Mr. Cieplinski explained that those who committed criminal acts were able to take advantage of West Haven being understaffed.

Neil Cavallaro, Superintendent of Schools for West Haven (for some fifteen years), testified that he oversees the Board of Education finance office, and noted that its budget was separate from that of the City of West Haven.  He described the "purchase order" procedures utilized by the school board, which differed from the city's "voucher" process. He also testified about buildings where JIL Solutions allegedly performed services (and for which it was paid out of West Haven's COVID relief funds); they included buildings that were unoccupied, including a school that had been closed for at least a decade.  The superintendent knew of no services that JIL performed for the Board of Education.

Mr. Cavallaro worked (in-person) throughout the pandemic, and explained that the Board of Education provided personal protective equipment (including cleaning supplies, masks, and protective suits) for its faculty and students out of money within its own budget and that it did not need to seek any money or equipment from any other governmental entity or department.  He testified that, to the date of his testimony, the school board still

had more than enough masks to service their own needs.  He was positive that L & H did no business with the schools, and that they did not provide them with any of the thousands of masks for which the company collected over $60,000.  Mr. Cavallaro went on to explain that the school did not buy or receive any of the backdrop screens or frames for which West Haven was billed by L & H.  In fact, he pointed out that the L & H "screen" designs that were depicted in the payment vouchers had a blue devil logo, and said "West Haven Middle School" and "West Haven Elementary School", but no such schools exist.  So, over $20,000 in COVID payments to L & H was for screens allegedly printed with the names of nonexistent schools.  Further, that invoice was dated February 1, 2021, and by that point, schools were moving away from distance learning and had students appearing (in person) at schools, five days per week; remote materials were not needed at that time.  Similarly, the school system did not need the type of "back to school" items that L & H purported to have supplied by way of an invoice dated April 15, 2021.  The school system also would not have purchased any conference screens with a "City of West Haven" background that was depicted in an L & H invoice.  In fact, the Board of Education had secured its own COVID budget of approximately $20 million to cover expenses for the items that kept their schools operating, such as technology and protective equipment.  He confirmed that the schools did not produce a voucher ordering $184,000 in alleged cleaning and assessment services.

Joseph Perno, Chief of Police for West Haven (since June of 2019) testified that JIL Sanitation did not provide any services for the West Haven Police Department, as the company's paperwork alleged.

Beth Sabo, Commissioner of Human Resources for West Haven, additionally confirmed that she knew of no services JIL Sanitation provided for the city or its property. She noted that the buildings where JIL claimed to have worked included a building that had closed around 2009 or 2010 (and that remained closed throughout the COVID-19 pandemic, with its water and electricity shut off since 2010 or 2011, a decade earlier), and an elementary school that had been closed and not used for any purpose since 2011. City ventilation systems were cleaned by United Restoration, and painting and setup for vaccine clinics was performed by the city's Building Department.  Ms. Sabo explained that West Haven often hired union employees, and even when they did not, they would require approval to hire non-union workers.  Ms. Sabo worked long and hard hours throughout the COVID-19 pandemic, and she had worked for the city for forty-six years; she knew of no work performed by JIL Sanitation for the City of West Haven.

Mark Magri, Administrator of West Haven's waste water treatment plant (where he had worked for thirty-six years), testified relative to the $184,019 JIL Sanitation invoice that purported to pay for assessment and cleaning at various West Haven buildings, including City Hall and the police department.  Mr. Magri confirmed that JIL never did any assessment, cleaning, or performance of any other service at the water pollution control facility.  He knew this because he and his staff did their own cleaning using their own equipment.  He authenticated a $454.71 invoice from April 3, 2020, that showed payment for supplies (from Colony Hardware) used to spray and disinfect buildings and trucks. Their own employees cleaned desks, furniture, heating and air conditioning systems, and trucks twice per week during the COVID-19 pandemic.

Robert Orifice was West Haven's Fleet and Equipment Superintendent.  He cared for over three hundred pieces of city equipment from weedwhackers to twenty-ton cranes. He, too, testified that JIL did no assessment, cleaning, or other work for West Haven.  The city's union janitors conducted the cleaning of the buildings with which he was familiar, but for a three-month period when a company called Pro-Clean was hired.

Assistant Commissioner of Public Works Robert Sandella further confirmed that JIL did no work for West Haven, and he confirmed that some of the buildings JIL claimed to service were abandoned or boarded up.

The defense presented testimony from Jeffrey Veenhuis, President and CEO of Surfacide (a disinfection equipment manufacturing company), who explained that he was called by Mr. Trasacco in October 2021 to discuss their equipment, and that Mr. Veenhuis sent a follow-up email for which Mr. Trasacco thanked him, but cross-examination revealed that Mr. Trasacco's initial contact with the company came on October 14, 2021, which was one week after federal agents overtly visited City Hall (on October 7) and Mr. DiMassa told Mr. Bernardo and Mr. Trasacco, "The jig is up."  For emphasis, the court reiterates that it was one week after federal agents appeared at City Hall to investigate the theft of public COVID funds when Mr. Trasacco *first* reached out to Surfacide.  Beyond this late attempt to call a company that could assist in providing the equipment that would allow Mr. Trasacco to make good on at least a portion of the services for which he already had been collecting payments from West Haven, Mr. Veenhuis conceded that Mr. Trasacco never placed **any** orders with Surfacide, and never bought **anything** from them.

The defense also provided testimony from Richard Dalton, Sales Manager at a Houston, Texas company called XtraLight, which sells UVC lighting, originally for indoor

agricultural use, but which started being sold during COVID because it happens to be germicidal and could be marketed for use in fighting bacteria and viruses.  Mr. Dalton testified that, from his company, he learned of Mr. Trasacco as a potential sales lead, and so Mr. Dalton called Mr. Trasacco in November of 2021 (again, *after* Mr. DiMassa explained that the "jig was up" due to the early October visit by federal agents to City Hall) and later followed up with an email in November 2021.   While Mr. Dalton sent Mr. Trasacco a sample piece of equipment with Mr. Trasacco paying only the shipping costs therefor, Mr. Dalton found it unusual (in fact, "wild") that Mr. Trasacco's inquiries provided the square footage of only entire buildings in which Mr. Trasacco claimed to have intended use for the UVC lights, whereas most inquiries gave measurements as to individual rooms and hallways where the lights would be put to use (possibly indicating for the jury that this late inquiry, long after West Haven funds were collected by JIL, showed a lack of genuine, legitimate intent to fulfill the obligations held out in the invoices and vouchers).  And after Mr. Trasacco received his free sample, neither he nor JIL Sanitation made any type of purchase from XtraLight.

In addition to all of this evidence and testimony, the jury heard extensively[5] from Michael DiMassa, the City Council Administrator who had been asked by the West Haven mayor to oversee distribution of the city's COVID relief funds.  At the time of his COVID fund supervision, Mr. DiMassa also was serving in the state House of Representatives.

Mr. DiMassa opened by immediately admitting that he stole $1.2 million from the City of West Haven by participating in three separate schemes: one with Lauren DiMassa,

---

[5] Mr. DiMassa testified throughout the fourth through the sixth days of evidence (Monday, November 28 – Wednesday, November 30, 2022), as recorded at pages 530 through 906 of the trial transcript.

one with John Bernardo, and one with John Trasacco (involving L & H and JIL). Throughout his testimony, he explained in great detail the manner in which he would submit untruthful vouchers in support of fake invoices to represent work and services not performed, allowing for the theft of public COVID funds. For example, he explained that there had been no discussions with the Board of Education about the purchase of masks, screens, stands, or other equipment purportedly provided by Mr. Trasacco. Mr. DiMassa got Mr. Trasacco's illegitimate invoices at a restaurant during nighttime hours, which was inconsistent with how he obtained legitimate invoices from actual suppliers of goods and services. Similarly, Mr. DiMassa provided Mr. Trasacco with checks from West Haven at the same local restaurant during nighttime hours, which was not how actual business normally was conducted. At some point, Mr. Trasacco gave Mr. DiMassa some miniscule number of masks and supplies that fell woefully short of the product listed in the illegitimate invoices that itself was never actually ordered. While walking the jury through the planning and execution of the criminal plan involving Mr. Trasacco and Mr. DiMassa, Mr. DiMassa explained that Mr. Trasacco slipped cash into Mr. DiMassa's pocket while at the restaurant, as an apparent kickback for the hundreds of thousands of dollars that Mr. DiMassa helped Mr. Trasacco unlawfully obtain from West Haven's COVID funds.

Eventually, in early October of 2021, Mr. DiMassa saw someone he believed to be an FBI agent at City Hall, and he learned that Mr. Bernardo was contacted by the FBI for information about Compass Investments (the conduit for the scheme with Mr. Bernardo). Together, Mr. DiMassa and Mr. Bernardo called Mr. Trasacco to say, "The jig is up." Nevertheless, Mr. Trasacco expressed a belief that Mr. Trasacco had done no wrong.

Overall, Mr. DiMassa believed that his scheme with Mr. Trasacco involved the theft of over $400,000.  Most of that money went directly to Mr. Trasacco, with about $10,000 being directed to Mr. DiMassa.  During that time, Mr. DiMassa was permitted use of a Beverly Hills home occupied by Mr. Trasacco, and he also continued to facilitate Mr. Trasacco's ongoing theft out of fear, though he tried to convince Mr. Trasacco to end the fraudulent activity.

Considering all of the evidence and testimony presented at trial, the record clearly contains more than enough support for the jury's guilty verdict as to Wire Fraud.   To the extent that the defendant suggests in his motion that it was somehow deficient for the indictment to have listed only "a single interstate wire transmission as the basis for the substantive wire fraud count charged in Count Two", ECF No. 248 at 3–4, the jury was free to consider all of the aforementioned evidence and testimony (as to both the L & H and the JIL schemes) in assessing Mr. Trasacco's knowing and willful criminal conduct related to the L & H fraud.  Further, the government enjoys prosecutorial discretion and is not obligated to pursue each and every crime that it has the ability to prove beyond a reasonable doubt (which often serves to benefit criminal defendants).  Mr. Trasacco offers no legal authority for his claim that a single example of wire fraud cannot support a conviction for the same.  Factually, the jury had a wealth of information as context that more than sufficiently supports its prompt[6] verdict.  In fact, Attorney Odongo argued that Nathan Musick's testimony as to Mr. Trasacco's financial transactions was repetitive, while he mapped out the numerous behaviors that exposed the defendant's fraud.

---

[6] By characterizing the same-day verdict as prompt, the court in no way suggests that the jury was hasty. The jurors took hours to deliberate, and asked questions that showed their careful consideration of both the facts and the law.

Mr. Trasacco argues, "L & H was incorporated in the State of California in March 2019, long before the COVID-19 pandemic or the prospect of pandemic-related contracts or funding." ECF No. 248 at 5. Still, the government did not charge, nor did it have to prove, that L & H was established for the purpose of carrying out the scheme it was used to advance, thus it is irrelevant for the defendant to point out that L & H's incorporation predated the pandemic. In fact, the jury reasonably could have found that, given its age, the "company" should have had clearer signs of legitimacy (such as tax records, documented sales or revenue, proof of delivered goods, or verified customers). While the burden of proof rested with the government, once it exposed the West Haven checks as the only apparent deposits into the company bank accounts, Mr. Trasacco's regular casino and ATM withdrawals from the L & H business account offered support for the jury's verdict rather than indicia of a legitimate and lawful business's activity. The jury also was able to consider that goods and services were not delivered as promised in the fraudulent paperwork, and whether West Haven entities such as the Board of Education ever ordered them in the first place (as with screens naming schools that do not exist, and services such as cleaning buildings that had been vacant for many years).

Finally, Mr. Trasacco argues that there is no direct nexus between the L & H check that the government used as its example of wire fraud in Count Two and JIL, *see* ECF No. 248 at 5 ("Although the Court also instructed the jury that they could 'consider the evidence related to JIL' in deliberating on Count Two, there was no evidence at trial suggesting that the charged check was in any way related to JIL Sanitation Services LLC ('JIL')."), the elements of Count Two (Wire Fraud) required no such nexus. Instead, the jury was able to consider that Mr. Trasacco used each company (L & H, and JIL) to

16

fraudulently obtain West Haven's COVID relief funds, as is fully supported by the record. And the jury reasonably could have viewed evidence of cash payments from Mr. Trasacco to Mr. DiMassa as "kickbacks" that showed Mr. Trasacco's appreciation for being permitted by Mr. DiMassa to carry out their fraudulent activities.

In all, the record makes clear that the jury was presented with more than enough evidence to support their reasonable conclusion that Mr. Trasacco committed wire fraud. Invoices were submitted for goods and services never ordered nor provided, and even when some nominal number of items was supplied (though never validly ordered), those delivered items fell far short of what the fraudulent invoices purported to request.[7]  The jury heard that the specific check charged at Count Two (which was generated because of a fraudulent voucher that was based on a fraudulent invoice, and then was issued by the City of West Haven, to L & H, in the amount of $68,728) was retrieved by Mr. DiMassa, who delivered it (at a restaurant, during nighttime hours) to Mr. Trasacco.  Tr. at 608–09. Mr. Trasacco then deposited that check into the L & H account,  Tr. at 446, and the jury heard testimony (without opposition or objection) that the check in question thereby affected interstate commerce, Tr. at 442, 453.  Based on the totality of the evidence (including the banking and personal activities of the defendant), and viewing, as it must, "the evidence in the light most favorable to the government," *Jabar*, 19 F.4th 66, 76, the jury reasonably could have found Mr. Trasacco guilty beyond a reasonable doubt of the Wire Fraud charged in Count Two, and Defendant's Motion for Acquittal, ECF Nos. 228, 248, as to this charge is **DENIED.**

---

[7] Of the 4,000 masks in a $63,356 order, Mr. Trasacco gave Mr. DiMassa 280 masks, seven backdrops, and ten stands.  Tr. 601.  This corresponded to Government Exhibits 13A and 13B.  Tr. 591–601.

### 2. Conspiracy to Commit Wire Fraud (Count One)

#### a) Scheme to Defraud re: L & H

Defendant next argues that the government failed to prove that there was a scheme to defraud the City of West Haven with respect to L & H.  ECF No. 248 at 7.  Specifically, he argues that "no rational juror could have found beyond a reasonable doubt that the two boxes that were present at trial were the only goods that Mr. Trasacco provided to Mr. DiMassa."  *Id.*  Defendant cites evidence that Mr. DiMassa delivered the boxes to the Federal Bureau of Investigation ("FBI") and that authorities never searched his residence.  *Id.* at 7—8.

The government argues in opposition that with respect to L & H and the boxes of products presented at trial, there was "ample evidence" on which the jury could conclude that these were the only products Mr. Trasacco provided or attempted to provide to the City of West Haven (including the testimony of Mr. DiMassa and that of multiple West Haven municipal employees).  ECF No. 259 at 6—8.  The government also notes testimony indicating subsequent invoices and no additional product deliveries.  *Id.* at 7— 8.  Finally, the government states that "the defendant's own actions confirm this fact as he moved onto a new scheme involving JIL with no effort to provide any additional product listed on the L & H vouchers."  *Id.* at 8.

There was sufficient evidence presented at trial to support the jury's finding that Mr. Trasacco was guilty beyond a reasonable doubt of a scheme to defraud with respect to L & H.  Specifically, the jury heard evidence that the boxes containing 280 masks, 10 stands, and 7 backdrops, Tr. at 598—601, were the only products Mr. DiMassa's received, *id.* at 603, despite payment to L & H of $68,728, *id.* at 608—09.  Additionally,

18

West Haven officials testified that no additional products were delivered (nor did the town have a need for any such products).  *Id.* at 83, 105—11.  The government presented evidence that L & H sent invoices to the City when no orders had been placed, Tr. at 534—35, 612—14, and no additional products were provided, *id.* at 609—10.  The jury was free to consider evidence and arguments regarding the fact that Mr. DiMassa, himself, delivered the boxes to the FBI, and the fact that that federal and state law enforcement authorities failed to search Mr. DiMassa's residence and garage.  However, based on all of the evidence introduced at trial, the jury could reasonably have concluded that the only products Mr. Trasacco provided were those introduced as Government's Exhibits 13A and B.  The jury was presented with the aforementioned evidence of Defendant's action in concert with Mr. DiMassa, and in furtherance of the criminal conspiracy to commit wire fraud with respect to L & H.  The Motion for Judgment of Acquittal based on a lack of sufficient evidence of a scheme to defraud as to L & H is **<u>DENIED</u>.**

### b) <u>Scheme to Defraud re: JIL</u>

With respect to JIL, Mr. Trasacco cites evidence of his efforts "toward completion of the JIL contract for a comprehensive assessment and study for UVC disinfection in West Haven."  ECF No. 248 at 8.  He notes that despite the government's evidence that the JIL invoice predated Mr. Trasacco's initial contact with Surfacide and XtraLight (the UVC disinfectant companies), the invoice only predated his contacts with those companies by one month and, as such, his conduct "is not criminal, or even unusual."  *Id.* (citing Kent Pierce, *Is the West Haven Waterfront Project Dead? The Mayor Doesn't Think So*, WTNH, Aug. 26, 2022, for the proposition that West Haven's Mayor has indicated she

remains hopeful about the subject project "after eight years."). He notes as significant the fact that he was not indicted in this case until February 17, 2022. *Id.* at 8—9.

With respect to JIL, the government notes evidence to the effect that as a result of the disparity between the funds paid and product provided, the L & H scheme became unsustainable and, consequently, "[Mr.] DiMassa, [Mr.] Trasacco, and [Mr.] Bernardo met to create a new scheme related to UV light cleaning of West Haven buildings, a service not requested by the town." ECF No. 259 at 5. The government cites Mr. DiMassa's testimony with respect to this scheme and the agreement among Mr. DiMassa, Mr. Trasacco, and Mr. Bernardo, to split the proceeds three ways. *Id.* at 5—6. It also cites to evidence of an invoice and a check relevant to that scheme and to the fact that there is no dispute that this check that was deposited into the JIL account, and that the deposit had the requisite impact on interstate commerce. *Id.* at 6. With respect to this scheme to defraud, the government points to Mr. DiMassa's testimony that Mr. Trasacco "never delivered any services associated with the JIL invoice." *Id.* at 8—9. Finally, it notes that Mr. Trasacco's communications with Surfacide and XtraLight occurred "after [he] learned from DiMassa that federal agents had visited West Haven City Hall . . . and . . . after virtually all of the 184K paid by West Haven had already been dissipated." *Id.* at 9 (citing DiMassa Testimony; Govt Ex. 11D at 5).

Despite Defendant's evidence of his claimed efforts to complete a contract for UVC cleaning services through Surfacide and XtraLight, the government introduced evidence that Mr. Trasacco agreed to a 40/40/40 split of proceeds from a scheme concerning JIL. Tr. at 655—62. The government further offered evidence of a JIL invoice, *id.* at 658—59 (Govt. Ex. 5B), and a resulting check to JIL in the amount of $184,000, *id.* at 660 (Govt.

5C), which Mr. DiMassa delivered to Mr. Trasacco, *id.* at 660—61.  The jury also heard evidence that JIL never provided services in connection with the invoice at issue.  *Id.* at 104 (Testimony of Neil Cavallaro, West Haven Superintendent of Schools), 177 (Testimony of Robert Orifice, West Haven Fleet and Equipment Assistant), 657 (Testimony of Mr. DiMassa).  Finally, although Defendant points to evidence that the invoice was submitted only shortly before payment, the government introduced evidence that Mr. Trasacco contacted Surfacide and XtraLight after[8] Mr. DiMassa informed him that law enforcement agents visited West Haven City Hall in connection with the charges in this case, *id.* at 665—66, and after the $184,000 paid to JIL largely had been dissipated.  Govt Ex. 11D.  In light of all of the evidence presented, the jury reasonably could have concluded that Defendant, through JIL, conspired to defraud the City of West Haven with the requisite intent.  Taking the evidence in the light most favorable to the government, the jury was presented with evidence of Mr. Trasacco's actions in concert with other named defendants, and in furtherance of the criminal conspiracy and defense counsel's arguments to the contrary are insufficient to disturb the jury's verdict.  The Motion for Acquittal based on a lack of sufficient evidence of a scheme to defraud as to JIL is **DENIED**.

### c) Lack of Agreement Between Defendant and Mr. DiMassa

Finally, Defendant argues that "there was never a meeting of the minds between Mr. Trasacco and Mr. DiMassa."  ECF No. 248 at 9.  With respect to L & H, he cites Mr. DiMassa's testimony regarding Mr. Trasacco's interest in providing Covid-related products, a video depicting production of apparel, Mr. DiMassa's visit to the L & H

---

[8] Mr. DiMassa testified that law enforcement entered City Hall in "early October."  *Id.* at 663-64.

warehouse, his belief that L & H was legitimate, the fact that Mr. DiMassa continued to ask for additional product from Mr. Trasacco after the initial delivery, and the fact that Mr. DiMassa was surprised when Mr. Trasacco made the cash payments at a restaurant.  *Id.* at 9—11.  According to Defendant, "If DiMassa believed that this was a conspiracy to defraud the City of West Haven, why would [he] expect more product from and continuously nag Mr. Trasacco, his supposed co-conspirator, about 'the issue of product'?"  *Id.* at 11.  With respect to JIL, Defendant cites Mr. DiMassa's testimony concerning statements Mr. Trasacco made about UV cleaning, Mr. Trasacco's expressed interest in "put[ting] something together" for Mr. DiMassa, and Mr. Trasacco's "offer to have someone walk through the buildings that were listed on the invoice."  *Id.*  He argues that there was no meeting of the minds because Mr. DiMassa testified that he only awarded contracts to Mr. Trasacco and continued "as the scheme progressed," out of fear.  *Id.* at 11—12.  According to Mr. Trasacco, this "evidence, if fully credited by the jury, amounts to intimidation or extortion, but not to wire fraud conspiracy."  *Id.* at 12.  With respect to testimony of the 40/40/40 split, Mr. Trasacco cites Mr. DiMassa's testimony that he never received, nor expected to receive, payment from the JIL check.  *Id.* at 12—13.  Finally, Mr. Trasacco notes that unlike Mr. DiMassa's conspiracy involving Compass Investments, with respect to which Mr. DiMassa created fake invoices for services that would never be performed and pursuant to which he conspired to receive the majority of the proceeds, Mr. DiMassa's agreement with Mr. Trasacco involved a legitimate expectation for goods and services and no expectation that Mr. DiMassa would receive any proceeds.  *Id.* at 13.

In opposition, the government references the previously discussed testimony regarding the agreement between Mr. DiMassa, Mr. Trasacco, and Mr. Bernardo, to split the proceeds from the JIL check.  ECF No. 259 at 9.  With respect to L & H, the government cites Mr. DiMassa's testimony regarding the kickbacks and the subsequent L & H invoices with no additional product provided.  *Id.* 9—10.

As the Second Circuit specifically has noted, fraudulent intent can be proven by circumstantial evidence, *Jabar*, 19 F.4th at 76—77, and "[w]hen the necessary result of the . . . scheme is to injure others, fraudulent intent may be inferred from the scheme itself."  *Guadagna*, 183 F.3d at 130 (citation omitted).  The evidence presented to the jury on the issue of Mr. Trasacco and Mr. DiMassa agreeing to conspire in order to defraud the City of West Haven of Covid-relief funds included Mr. DiMassa's testimony regarding the 40/40/40 split of the JIL scheme's proceeds, Tr. at 655—57, and Mr. DiMassa repeatedly receiving from Mr. Trasacco (at a restaurant) cash payments from the L & H scheme, *id.* at 602—03, 625—26, as well as the fact that after Mr. Trasacco delivered a small amount of product that fell short of the amount listed on the relevant invoice, *id.* at 599—601, invoices continued to be submitted for payment without any further deliveries and without the City of West Haven placing any orders for the goods described therein, *id.* at 609—14.  The jury also could consider whether, in conducting legitimate business, Mr. Trasacco would have delivered any contract goods directly to Mr. DiMassa, at a restaurant.  It could consider why, after the government highlighted the meager efforts to supply minimal contract goods, the defense failed to establish (either when presenting its own witnesses and testimony, or on cross examination) that additional contract goods actually were delivered as promised (and for which Mr. Trasacco was paid).  Taking this

23

evidence in the light most favorable to the government, as it must, and even considering Mr. DiMassa's statements regarding his initial beliefs regarding the legitimacy of L & H, fear of Mr. Trasacco, and doubt regarding payment pursuant to the JIL invoice, a reasonable jury could have found beyond a reasonable doubt the requisite agreement to engage in a conspiracy to commit wire fraud.  The jury was presented with sufficient evidence as to criminal intent, and as to a criminal conspiracy.  The court has "take[n] seriously [its] obligation to assess the record to determine . . . whether a jury could *reasonably* find guilt beyond a reasonable doubt." *United States v. Clark*, 740 F.3d 808, 811 (2d Cir. 2014) (Newman, J.) (emphasis in original), and concludes that Defendant has failed to carry his burden.  There is sufficient evidence to support the jury's guilty verdict in this case and the court will not "substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury." *Jabar*, 19 F.4th at 76 (citation omitted).  This simply is not a case in which evidence against the defendant is "nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt . . . ." *Id.* (citation omitted).  The Motion for Acquittal on this basis is **DENIED**.

## B.    Motion for New Trial

Defendant also has filed a Motion for a New Trial based on the admission of testimony concerning individuals with whom he associated at a restaurant called Doma and, specifically, individuals by the names of John Taddei and Johnny Mop[9].  ECF No. 249 at 1.  He also cites as error, admission of testimony indicating that Mr. Trasacco

---

[9] Although spelled differently in the transcript and the government's brief, the court will use the spelling of these individuals' names, as articulated in Defendant's brief, for purposes of the within decision.

previously spent time in prison. *Id.* at 1—2. Finally, Mr. Trasacco relies on statements made in the presence of the jury, such as evidentiary disputes and the court's statements that Defendant claims "disparage[d] defense counsel." *Id.* at 2. For the following reasons, the Motion is **DENIED**.

On a Rule 33 motion for a new trial the court must be "satisfied that competent, satisfactory and sufficient evidence in [the] record supports the jury's finding that [the] defendant is guilty beyond a reasonable doubt . . . . In making this assessment, the judge must examine the totality of the case. . . . There must be a real concern that an innocent person may have been convicted." *Sanchez*, 969 F.2d at 1414. It is well-settled that "only when it appears that an injustice has been done that there is a need for a new trial 'in the interest of justice.'" *Id.* Although the court's discretion is broader in granting a new trial pursuant to Rule 33, than in rendering a judgment of acquittal pursuant to Rule 29, "that discretion should be exercised sparingly." *Id.*

### 1. *Testimony Concerning Doma and John Taddei*

Mr. Trasacco first argues that references to "the guys that hung around Doma,"[10] and, in particular, John Taddei ["Mr. Taddei"] and an individual identified by "the nickname 'Johnny Mop,' . . . taken together, were not-so-subtle efforts to insinuate that Mr. Trasacco, an Italian-American, had criminal associations. . . ." ECF No. 249 at 3. Defendant further states that "the government went out of its way to invoke these names," during questioning and its closing argument, *id.* at 7, 12, and that it made reference to the "Doma gang". *Id* at 7—8. Defendant also notes Mr. DiMassa's testimony regarding a

---

[10] Defendant specifically identifies Doma as "an Italian-American restaurant and pizzeria in Branford, Connecticut." ECF No. 249 at 3.

"gentleman in a hoodie" (who allegedly came to Mr. DiMassa's home after his arrest in this case) as unfairly prejudicial. *Id.* at 11—12. In conclusion, Defendant notes the fact that "John Taddei sounds almost exactly like John Gotti, perhaps the best-known Italian-American gangster since Al Capone," and that the aforementioned "testimony, in combination, was extraordinarily inflammatory, and its probative value did not substantially outweigh the danger of unfair prejudice." *Id.* at 12—13.

The government cites the relevance of transactions that occurred at Doma and, in particular, evidence of Mr. Trasacco's nighttime delivery of products to Mr. DiMassa in a parking lot of that restaurant, and Mr. DiMassa's resulting concern for his safety. ECF No. 260 at 3—4. The government also points out that Mr. DiMassa's identification of Mr. Taddei and Johnny Mop (as the individuals with whom Mr. DiMassa associated at Doma) was relevant to the JIL UV light cleaning scheme. *Id.* at 4. Specifically, the government notes Mr. DiMassa's testimony that Mr. Trasacco proposed the UV light cleaning idea and that Mr. Trasacco mentioned Johnny Mopp and John Taddei in connection with the new scheme. *Id.* at 4—6.

In a motion in limine, filed prior to trial, Defendant sought to preclude any references linking Mr. Trasacco to organized crime because of the "inflammatory" and "prejudicial" nature of any such evidence. ECF No. 168 at 1—2. Upon the government's assurance that it instructed it witnesses not to make reference to organized crime and that it would not elicit any such testimony, Tr. at 196,[11] the court denied the motion without prejudice, based on the government's representations. ECF No. 175 at 3.

---

[11] The government specifically stated that it "[would] not offer whether he's a formal member or even an associate of organized crime," and it "instructed all the witnesses," on that point. *Id.* at 197. However, the government also noted the existence of "a number of issues . . . and the evidence will establish that Mr.

After a thorough review of the evidence in connection with the issues raised, the court concludes that the record does not reveal the requisite level of prejudice warranting a new trial. First, with respect to Mr. Taddei and Johnny Mop, Mr. DiMassa was the first to identify them and he did so in relation to the fact that they were two of the individuals with whom Mr. DiMassa met at Doma. Tr. at 566. Mr. DiMassa further testified that these individuals were identified by Mr. Trasacco in connection with performing a "walk-through of buildings" with regard to the proposed UV light scheme. Tr. at 653. The court acknowledges that in addition to Mr. DiMassa's statements identifying these individuals, the government made reference to them in its subsequent questioning. Tr. at 566, 654, 661. However, these references largely were responsive, or they followed Mr. DiMassa's testimony, or they occurred when reiterating questions due to Defendant's objections.[12] Further, the government used the names only once in its closing, Tr. at 1073. Although Mr. Taddei's name bears some resemblance to that of John Gotti, "Taddei" appears to be his actual surname, and it was used in proper identification. The government neither mis-used nor over-emphasized it. The government established the relevance of testimony regarding John Taddei and Johnny Mop in relation to the UV light cleaning scheme.

In addition, when the government made reference to the "Doma gang" in its questioning of Mr. DiMassa, Tr. at 672, the court sustained defense counsel's objection to use of the word "gang," and the government withdrew the question; the government instead asked Mr. DiMassa about the "folks [he] knew at Doma." *Id.* The court thereafter

---

Trasacco instills fear to get people to do what he wants." *Id.* Thereafter, the government instructed Mr. DiMassa, while he was on the witness stand and while the jury was not in the courtroom, that "under no circumstances, none, zero, none, will you ever reference organized crime. Do you understand that?" *Id.* at 558. Mr. DiMassa responded in the affirmative. *Id.*

[12] The court notes defense counsel's reference to "Johnny Mop" in its own objection. Tr. at 654.

instructed the jury that "[i]f an objection was sustained, this means you were to ignore the question asked . . . ." *Id.* at 1145.

With respect to Defendant's objection to testimony regarding the "gentleman in a hoodie", Mr. DiMassa recalled, after watching home security camera footage, "see[ing] a gentleman in a hoodie, completely [sic] the hood covering most of his face from the view of this camera." *Id.* at 674. After objection to, and argument (out of the jury's presence) regarding this testimony, the court sustained counsel's objection and prohibited further testimony as to what Mr. DiMassa "may or may not have seen on the video that no longer exists." *Id.* at 686.[13] Although the court did not strike this portion of the testimony, there was no further questioning, nor testimony on the subject and the court noted the relevance of Mr. DiMassa's testimony regarding his feeling fearful from the experience. *Id.* at 687. Even if this portion of Mr. DiMassa's statement regarding what he saw on the video was hearsay, and should have been stricken, "the trial judge's rejection of all or part of the testimony of a witness or witnesses does not automatically entitle a defendant to a new trial." *Sanchez*, 969 F.2d at 1414.

The court concludes that this testimony, even considered in conjunction with the entire record of this case, and other aforementioned references allegedly providing

---

[13] The court specifically noted that it had "not heard any other means through which Mr. DiMassa would know of what he's about to testify" and that "[t]he video in question is not available to the defendant, to the accused." *Id.* The court sustained counsel's objection because there was "no additional evidence . . . tying the individual that Mr. DiMassa alleges to have appeared in the video to Mr. Trasacco, save what has been argued by the government which is Mr. Trasacco's comments in advance that someone from Doma would be delivering food." *Id.* The court then noted Mr. DiMassa's testimony that the experience made him "concerned," and asked for any clarifications. *Id.* at 687. Defense counsel "move[d] to strike the previous testimony regarding anything from the recording." *Id.* The court denied the Motion to strike the testimony in its entirety, noting the relevance of Mr. DiMassa's testimony regarding his feeling fearful from the experience and stating that it would "preclude testimony regarding what he may or may not have seen on video." *Id.* Trial thereafter continued without further testimony concerning the security camera footage.

indications of Mr. Trasacco's association with organized crime, does not present the requisite "extraordinary circumstances", *id.*, warranting "a new trial to avert a perceived miscarriage of justice." *Id.* at 1413. The defendant has failed to prove that the challenged questioning and testimony, casts Mr. Trasacco in a such a light that unfair prejudice warrants a new trial.

### 2.    *Testimony Concerning Mr. Trasacco's Time in Prison*

Defendant next argues that testimony concerning time he spent is prison should have been excluded because the danger of unfair prejudice outweighed its probative value pursuant to Federal Rule of Evidence 403. ECF No. 249 at 14.[14] He avers that "this testimony was essentially an end-run" of the court's ruling on Defendant's pretrial motion in limine seeking to prevent introduction of Mr. Trasacco's past convictions. *Id.* at 16. Defendant also notes that the jury's request to sit together in the jury box for the reading of the verdict was an indication that they harbored fear of Mr. Trasacco. *Id.*

In opposition, the government cites the transcript and notes "it plainly shows that Trasacco told DiMassa that he was in prison," and, as such, the statement qualifies as an exception to the hearsay rule because it amounted to "an admission of a party opponent, not hearsay." ECF No. 8—9. The government additionally notes that the statement is relevant to the issue of Mr. DiMassa's motivation to defraud the City of West Haven "without receiving an equal share"; his stated fear of Mr. Trasacco. *Id.* at 9—10.

The relevant testimony was as follows:

Q. [A]t the initial meeting, what did Mr. Trasacco tell you about himself?

---

[14] Defendant also argues that the statement should have been stricken as hearsay because of its position that Mr. DiMassa's only knowledge of Mr. Trasacco's time in prison came from Mr. Bernardo, and not from Mr. Trasacco. ECF No. 249 at 15.

A. He told me that he wrote screenplays or was a writer. He told me that he had been to prison in the past. He wrote in prison. He invented in prison. He told me about a coffee cup.

Tr. at 559.  The court overruled Defendant's objection based on Mr. DiMassa's response that it was information he received directly from Mr. Trasacco, a party opponent in this case.  *Id.* at 560; *see* Fed. R. Evid. 801(d)(2)(A).  Therefore, the statement was not hearsay, and it properly was admitted.  In addition, as the court specifically noted during argument on this issue,[15] the statement with respect to Mr. Trasacco having spent time in prison was directly relevant to Mr. DiMassa's fear and motivation in continuing to commit the fraud involving Mr. Trasacco.  In that regard, the court concludes that it was not sufficiently prejudicial such that any prejudice outweighed its probative value pursuant to Rule 403.  *See United States v. Ahmed*, 2016 WL 3647686, at *6 (E.D.N.Y. July 1, 2016) (holding that one basis for which evidence of uncharged criminal conduct with respect to fraudulent billing practices was admissible was because it was "'necessary to complete the story of the crime on trial'") (quoting *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000)).  Defendant's observation that the jury sat together (in the jury box) for the reading of their verdict, despite having been spread out on different sides of the courtroom during trial, is speculative and insufficient evidence to support a finding that the statement concerning Mr. Trasacco having spent time in prison instilled fear in the jurors and worked sufficient prejudice such that it outweighed the value of that testimony. This is particularly true where even the alternate jurors (who were free to sit in the main

---

[15] During argument (outside of the jury's presence), the court noted that "firsthand knowledge would not be required for it to be relevant and for it to pertain to this witness Mr. DiMassa's state of mind."  *Id.* at 548—49.

audience, or to leave altogether) asked to sit among the seated jurors in the jury box. During the trial, the jury was spaced out in the well of the court, due to concerns with respect to the Covid-19 pandemic, and Mr. DiMassa's testimony regarding the statement at issue occurred on the fourth day of a seven-day trial (with the verdict delivered after deliberations on the eighth day). The jury only requested that they sit together for the reading of their verdict at the end of deliberations and for the final, brief reading of the verdict on the final day. The court is mindful of its responsibility to "be careful to consider the cumulative impact of [the] evidence on the jury and to avoid the potential prejudice that might flow from its admission." *See United States v. Wallach*, 935 F.2d 445, 472 (2d Cir. 1991). The evidence at issue was properly admitted and, even when considered in conjunction with the additional evidence referenced above, fails to amount to unfair prejudice warranting a new trial.

### 3. Evidentiary Issues and "Disparaging" Counsel

Defendant next argues that the court erroneously permitted argument on evidentiary issues in the jury's presence[16] and also "suggested to the jury that the defense was unnecessarily prolonging the trial and wasting the jurors' time." ECF No. 249 at 17.

In assessing whether the trial judge's comments warrant a new trial, or rise the level of reversible error, "[t]he test is whether the jury was so impressed with the judge's

---

[16] Defendant states that such instances include those during which the court conducted sidebar arguments. ECF No. 249 at 17. Defense counsel avers these arguments "were within the hearing of several jurors". The defense's assumption that any of the jurors could hear arguments conducted at sidebar is purely speculative. As the government notes, ECF No. 260 at 12, the court utilized noise cancelling technology during all sidebar conferences. Further, the court made repeated efforts to hear counsel's arguments regarding evidentiary disputes outside of the jury's presence. In fact, after one short exchange, during which the defense requested a sidebar, Tr. at 674—75 (objection to testimony regarding what Mr. DiMassa saw on a home security video), the court excused the panel for their afternoon recess and allowed counsel to thereafter make their respective arguments. *Id.* at 675, 676—87.

partiality to the prosecution that it became a factor in determining the defendant's guilt . . . or whether it appear[ed] clear to the jury that the court believe[d] the accused is guilty." *United States v. Amiel*, 95 F.3d 135, 146 (2d Cir. 1996) (internal citations omitted); *see also United States v. Dowdell*, 737 F. App'x 577, 584 (2d Cir. 2018) (holding that although "[t]he court no doubt expressed 'impatience, dissatisfaction, annoyance, and even anger' in response to all of this, [it was] not so much as to 'establish[ ] bias or partiality.'") (quoting *Liteky v. United States*, 510 U.S. 540, 555—56 (1994)).  While it "must take care not to give the jury an impression of partisanship on either side," *United States v. De Sisto*, 289 F.2d 833, 834 (2d Cir. 1961), the court may "question witnesses, and [has] 'wide latitude in the management of the courtroom . . . .'" *Fraser v. Wyeth, Inc.*, 992 F. Supp. 2d 68, 96 (D. Conn. 2014) (quoting *United States v. Blackwood*, 456 F.2d 526, 529 (2d Cir.1972)).

Far from a "lack of patience and lack of restraint", ECF No. 249 at 24, during the trial of this case, the court granted both the defense and government considerable leeway in presenting their respective cases as they saw fit.  The occasions on which it noted the pace of trial and keeping on that pace, the court's interest was in adhering to the schedule as previously agreed to by counsel, *see* Minutes of Pretrial Conference, ECF No. 153 at 2 (indicating discussion of dates of trial), and articulated to the jury, *see* Jury Selection Tr. at 10—11, in setting the case for trial.  Specifically, after the lunch break on the first day of trial, and outside of the jury's presence, the court stressed its "initial concern regarding pace" as only one witness had been questioned.  Tr. at 94.  The comment was a reminder to both counsel.  Specifically, the court noted that with respect to trial on Wednesday, November 23, 2022 (the day before the Thanksgiving holiday), it wanted to be "be mindful of our jurors who we held late at jury selection as well," and the court stressed the

importance "of the pace going forward" in order "to hold their interest and attention . . . ." *Id.* Later, when excusing the jury early on November 23, 2022, the court stated, "[f]olks, thank you for your patience, attention, cooperation. . . .  I'll work with the lawyers to make sure our pace remains on track or regains track and we will go from there."  *Id.* at 492. On November 29[17] and 30, 2022,[18] the court expressed its intention to stay on the prescribed schedule.   Despite Defendant's arguments, the court's comments did not suggest that the delay was the fault of the parties, nor "point[] blame at the defense," ECF No. 249 at 23, but only indicated its objective to assure the jury that the court and counsel would make their best efforts to keep the trial on schedule.

Defense counsel cites as evidence of the court's prejudice against them, references to testimony that was "barely relevant" and the fact that the court "urge[d] counsel to make a point . . . soon", *id.* at 339.  Such references, and the court's colloquy with counsel regarding his questions to Mr. Cieplinski as to the CohnReznick Report,[19] *id.* at 338—39, indicate the court's efforts to determine the relevance of the line of questioning[20] and to be sure that the case remained on the aforementioned, and

---

[17] The court thanked the jury for their patience and noted "it's incumbent on us to remain true to the schedule as anticipated" and its "true intention to keep this trial on track to be done when we said it would be done." *Id.* at 841.  Subsequently, and outside of the jury's presence, the court reminded counsel about the pace of trial and stated that it "continue[d] to, despite its warnings and requests, to have concerns regarding the pace of trial."  *Id.* at 852.  The court's expressed concerns were made in support of its continued effort to keep the case on track.

[18] The court advised counsel that "[t]he record clearly reflects the time and length of the transcripts to let the parties put on their case and manage their time within the representations as to the length of this trial as published to the jury."  *Id.* at 861.  The court went on to "remind all counsel to do their best to adhere to that schedule that they estimated and . . . acknowledge[d] [counsel's] work toward [their] stipulation . . . ." *Id.* at 861—62.

[19] Defense counsel cites as prejudicial the court's subsequent statements regarding counsel's question of Mr. Cieplinski.  *Id.* at 341—42.  However, that exchange, rather than "result[ing] in further disparagement of defense counsel", ECF No. 249 at 18, was merely the court's explanation of the basis for sustaining the government's objection to the question (as it was posed).

[20] Despite defense counsel's assertion of an unfettered right to cross-examination in a criminal trial, for purposes of legal clarity, the court notes the collateral nature of this issue in the context raised, and the fact

requested, trial schedule.  As counsel acknowledges, it was the defense who specifically refenced "wasting" the jury's time when counsel stated, "I would like to think that the jury is not thinking I'm wasting . . . time making a point, but I'll definitely move on, Your Honor." *Id.* at 339.

The court permitted both the government and defense to extensively question witnesses without significant restraint or limitation.  *See* Tr. at 363—87, 389—94 (Defense Cross Examination of Frank Cieplinski); Tr. at 432—56, 458—69 (Government Direct Examination of Nathan Musick).[21]  In fact, rather than constricting counsel to a certain number of days or a timeframe, the court explored dates during the weeks of December 12th through 16th and December 19th through 23rd, should additional days become necessary.  *Id.* at 861.[22]  With respect to its cross-examination of Mr. Cieplinski, defense counsel argues that despite the government's stipulation as to authenticity, the court

---

that trial judges have wide discretion in setting the scope of cross-examination, and particularly recross, as noted by the United States Court of Appeals for the Second Circuit in assessing the limits set by Judge Constance Baker Motley in *United States v. Kahn*, 472 F.2d 272 (2d Cir. 1973), and in finding harmless Judge Alfred V. Covello's complete preclusion of recross examination as to a witness who had been subject to redirect, in *United States v. Vasquez*, 82 F.3d 574 (2d Cir. 1996).

[21] Defense counsel cites as indicative of the court's prejudice against it, the fact that the court overruled counsel's objection to permitting the government's lengthy questioning of the bank records custodian.  ECF No. 249 at 21.  Defense counsel notes the court's comment in which it stated as follows: "[t]he [c]ourt finds that -- first, thank you. First the [c]ourt finds that it gave significant leeway yesterday with respect to Attorney Hayes in his cross-examination of Mr. Cieplinski. The Court finds this is voluminous data, however, that the government's questioning and this witness's testimony is directed, it's explaining to the jury what it is they would be looking at with respect to the documents that have been entered into evidence as full exhibits." *Id.*; Tr. at 465—66.  The exchange indicates the court's explanation rather than prejudice against the defendant and/or his counsel.  The court's statement reiterating that it had overruled the objection, Tr. at 469, was meant to clarify the record on that point and not indicative of any such prejudice.

[22] On the second to last day of trial, in sustaining the government's objection, the court noted it had "allowed great latitude" but that defense counsel's question had been "asked and answered".  Tr. at 874.  The court directed counsel to "[p]lease, move on."  *Id.*  The defense cites this ruling as evidence of the court's prejudice against it, but the transcript clearly indicates support for the ruling.  At that time, on the seventh day of evidence, the court's direction that counsel "[p]lease, move on" was another effort to assure that the trial remained on schedule.

"required the defense to walk the witness through the exhibit, which included 72 pages[23] of invoices, vouchers, and check copies, before admitting the exhibit in full."  ECF No. 249 at 19—20.  However, as indicated by counsel's respective statements[24], that method was necessary in order to establish a foundation for admission of that entire document, absent the defense selecting discrete pages for admission.

In a further citation to the court's perceived "impatience", counsel cites an exchange that took place after the court excused the jury for the day, on November 22, 2022.  ECF No. 249 at 20—21.  That exchange involved a discussion between the court and counsel (again, after the jury had been excused), during which counsel stated "[i]t seems as though I'm holding things up."  Tr. at 395.  Thereafter, counsel stated that "it was bizarre we had to go through that when there was a stipulation that this was their evidence . . . ." (referring to defense counsel's cross-examination of Mr. Cieplinski).  *Id.* at 397.  The defense further stated that counsel "could sense some impatience".  *Id.*  In its response, the court noted the uninterrupted leeway it gave the defense and explained its decision requiring that the defense lay a foundation for the introduction of an untabbed

---

[23] Counsel stresses as significant the court's repeated mention of the length of the document.  ECF No. 249 at 20.  However, as the court noted, the exhibit was not identified in the table of contents of the defendant's binder, nor tabbed.  *Id.* at 362.  Furthermore, the court's first reference to the length of the document was in regard to whether counsel intended to question the witness as to the entire submission or just a portion thereof.  *Id.* at 361.  It then made reference to the length of the document in asking if counsel intended to seek admission of the entire record.  *Id.* at 362.  Later, the court referenced the length of the document in admitting it as a full exhibit.  *Id.* at 388.  The court sought to properly identify the untabbed document, not to cause any prejudice to Defendant by making reference to its length.

[24] The record reflects that the government objected to introduction of the full exhibit based on a lack of foundation.  Tr. at 361.  The government consented to defense counsel directing the witness to particular pages.  *Id.*  Defense counsel responded that he "only ha[d] a number of them that I'll go through, so I'll do it that way."  *Id.*  The court then inquired whether the defense would be asking the witness about, and seeking to admit, a discrete portion of the exhibit, or to have the entire record admitted, to which counsel responded "I am going to have to give the witness Defendant's Exhibit 1004 and go through them individually, each group as the government did with their 1A through 5B."  *Id.* at 362.  The court then asked counsel to state the length of the document for the record.  *Id.* at 363.

exhibit that defense counsel had submitted to the Clerk of Court that day. *Id.* at 397—99. After hearing the arguments of counsel, the court then noted that "*the parties*" remained free to stipulate as to the admission of any documents and encouraged them to do so. *Id.* at 400—01.[25]

The transcript of the trial in this case indicates the court's impartiality and efforts to keep the trial on pace, in adherence with the previously agreed to schedule that was published to the jury. The defendant has failed to establish the court's "participation during trial" such that "it appear[ed] clear to the jury that the court believe[d] the accused [was] guilty." *United States v. Nazzaro*, 472 F.2d 302, 303 (2d Cir. 1973). Rather, the court impartially exercised its "'wide latitude in the management of the courtroom . . . .'" *Fraser*, 992 F. Supp. 2d at 96 (quoting *Blackwood,* 456 F.2d at 529); see *United States v. Pineda Castro*, 795 F. App'x 635, 656 (11th Cir. 2019) (noting the trial court's "discretion to manage the proceedings").

### 4.    *Evidentiary Support for Verdict*

In support of its final argument, defense counsel cites its Rule 29 Motion for Judgment of Acquittal, and argues there was insufficient proof to support the verdict. ECF No. 249 at 24—25. In light of the court's foregoing denial of that Motion, and its reasoning herein, the Motion for a New Trial on this basis hereby is **<u>DENIED.</u>**

---

[25] The court stated (to both counsel for the government and the defense, again, outside of the jury's presence), "[t]his is your case, your jury." *Id.* at 401. When defense counsel asked the court to repeat that comment, the court stated "[t]his is your case and your jury to keep with you or to lose." *Id.* Despite counsel's argument, ECF No. 249 at 21, the statement was directed to both sides and not a reflection of the perceived impatience with defense counsel.

**IV.     CONCLUSION**

Defendant's Motion for Judgment of Acquittal, ECF Nos. 228, 248, and Motion for a New Trial, ECF Nos. 228, 249, are **DENIED.**

**IT IS SO ORDERED** this 2nd day of April, 2023, at Hartford, Connecticut.

_____/s/_____
OMAR A. WILLIAMS
UNITED STATES DISTRICT JUDGE
